1  TERRI KEYSER-COOPER
   Law Office of Terri Keyser-Cooper
2  Nevada Bar No. 3984
3  P.O. Box 147
   Spirit Lake, ID 83869-0147
4  (208) 623-6106
5  (775) 674-2531

6  DIANE K. VAILLANCOURT
   Law Office of Diane K. Vaillancourt
7  California Bar No. 181348
8  849 Almar Ave., Suite C403
   Santa Cruz, CA 95060
9  (831) 454-0112

10  *Attorneys for Plaintiff Rene Botello*

11

12          **UNITED STATES DISTRICT COURT**

13             **DISTRICT OF NEVADA**

14  RENE BOTELLO,
                                    Case No. _
15          Plaintiff,

16      vs.
                                    **COMPLAINT**
17  RICHARD GAMMICK, JOHN HELZER,
18  and WASHOE COUNTY,

19          Defendants.

20  _____/

21          **PRELIMINARY STATEMENT**

22      This case challenges the right of an elected public official, Washoe County District

23  Attorney Richard Gammick, and his deputy, John Helzer, to punish a dedicated public employee,

24  Rene Botello, for speaking out on a matter of vital public concern. It is a classic case of

25  whistleblower First Amendment violation – retaliation for exercise of protected speech.

26      In December 2001, plaintiff Rene Botello, then a child sexual assault investigator for the

27  Washoe County Sheriff's Office, learned that two nurses who regularly examine children for child

28  sexual abuse and testify as to their findings had reached objectively incorrect medical conclusions.

CV-N-03-0195-ECR-VPC

1    One nurse in particular, Lily Clarkson, had examined a female child and concluded the child had

2    been sexually penetrated, had no hymen, and was the clear victim of sexual abuse. Following

3    through with further medical examinations, Botello learned those findings were in error—one

4    hundred percent incorrect.

5        Since criminal prosecutions for child sexual abuse typically involve serious family

6    disruption, severe emotional distress, and long-term convictions, Botello became concerned that

7    these nurses may have testified erroneously in other cases. It would be disastrous, he believed, if

8    children were wrongfully removed from their homes or individuals sent to prison based on

9    erroneous testimony.

10        Botello immediately spoke out. He sought a third-party review of the CARES nurses'

11    forensic examinations, he discussed his findings and concerns with his fellow investigators, and he

12    lobbied his superiors to audit the CARES program and to ask District Attorney Richard Gammick

13    to reopen convictions based on the nurses' testimony.

14        As a result, Botello suddenly, and alarmingly, found himself in a political minefield –

15    forced to walk a tightrope between direct orders that he "keep his mouth shut" and his personal

16    need to know justice had been served. In a crisis of conscience, Botello concluded he had to "do

17    something" and filed a complaint with the Nevada Attorney General's Office and the FBI alleging

18    potential abuses in the CARES program.

19        Botello experienced immediate retaliation from Gammick and his Chief Deputy John

20    Helzer. Alleging Botello was not a "team player," the obviously angry District Attorney and his

21    chief deputy notified Botello's employer, the Washoe County School Police, that the District

22    Attorney's Office would refuse to prosecute any and all cases brought by Botello and he would not

23    be permitted to testify in any cases. This blanket refusal has interfered with Botello's ability to do

24    his job, effectively rendering him useless as an investigator. If the District Attorney will not

25    prosecute his cases, if he cannot testify to his observations, Botello cannot do his job.

26
                              **JURISDICTION AND VENUE**
27
         1.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First Amendment,
28
      the Fourteenth Amendment, and pendant state law. Jurisdiction is founded on 28 U.S.C. §§ 1331

1   and 1343 and the aforementioned statutory and constitutional provisions. This court has

2   jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. § 2201, and Federal

3   Rules of Civil Procedure, Rule 57. Plaintiff further invokes the pendent jurisdiction of this Court

4   to consider claims arising under state law.

5        2.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391.

6   **PARTIES**

7        3.     Plaintiff RENE BOTELLO ("plaintiff") is a citizen of the United States and a resident

8   of the State of Nevada.

9        4.     Defendant RICHARD GAMMICK ("defendant") is the Washoe County District

10  Attorney and a policymaker for defendant Washoe County. Defendant Gammick is sued in his

11  individual and official capacity. At all times herein, Gammick was acting under color of law and

12  pursuant to his authority as the agent, servant, and employee of defendant Washoe County.

13       5.     Defendant JOHN HELZER is the Washoe County Chief Deputy District Attorney.

14  Defendant Helzer is sued in his individual and official capacity. At all times herein, Gammick was

15  acting under color of law and pursuant to his authority as the agent, servant, and employee of

16  Defendant Washoe County.

17       6.     Defendant WASHOE COUNTY is a county within the State of Nevada and at all

18  times relevant hereto-employed defendants Gammick and Helzer.

19  **FACTS**

20       7.     Plaintiff Rene Botello is a fifteen-year veteran law enforcement officer with glowing

21  performance evaluations and numerous commendations to his credit. In August 1998, he joined

22  the Washoe County Sheriff's Office ("WCSO") after working ten-years as a peace officer with the

23  Los Angeles Police Department. Botello worked in WCSO's Detective Division from September

24  2000 until he resigned in September 2002. For the last year and a half of his tenure with WCSO,

25  he was assigned to the Crimes against Juveniles Unit where he investigated sex crimes against

26  children. Botello's job assignment required him to testify in criminal prosecutions regarding the

27  results of his investigations.

28

COMPLAINT—*BOTELLO v. GAMMICK  et al.*                                

8.   Botello's superiors at WCSO have commended him for his integrity and willingness to do the "right thing." These are considered to be his "primary strengths." His "integrity is second to none," wrote a recent evaluator, who further explained, "Detective Botello is an aggressive investigator who wants to place suspects into custody for crimes that are committed against children, however he has shown that he is not willing to compromise his integrity and overlook inaccurate information in order to do so."

9.   Botello's evaluations also praise him as a "team player," someone who demonstrates "esprit de corps" on a daily basis and goes out of his way to assist others, maintain harmonious work relations, and deals tactfully and effectively with fellow workers and members of the public.

10.   In addition, Botello was and remains one of a few Spanish-speaking investigators in Washoe County. As such, he is in high demand and is frequently called upon by fellow workers and outside police departments, including Sparks Police Department (SPD) and Reno Police Department (RPD), to render assistance in investigating cases involving Spanish-speaking victims, suspects and witnesses. He has been commended for his willingness to assist others with investigations requiring a Spanish-speaking investigator.

11.   Up through December 2001, Botello was also considered extremely successful in his work with the Crimes against Children Unit, which required him to work closely with various sexual assault support service providers. Botello was commended for being "professional, kind, and caring" when dealing with sexual assault victims. His thorough investigations and his concise and descriptive reports also garnered him praise.

12.   As part of Washoe County's effort to address sex crimes against juveniles, since about year 2000, Washoe County and defendant District Attorney Richard Gammick have contracted with CARES (Child Abuse Response and Evaluations) to perform forensic medical examinations on juvenile sexual assault victims. The CARES examination results are used to establish probable cause for arrest of suspects, justify removal of children from their homes by Child Protective Services, and convict alleged offenders in criminal prosecutionsCARES employs two nurses, Lily Clarkson, L.P., and Marie Norberg, R.N., to provide forensic medical examinations on suspected juvenile sexual assault victims for prosecution purposes.

13.     For approximately three years, the two CARES nurses have been recognized in Washoe County courts as experts in the area of sexual assault examinations. It is believed that based solely on evidence provided by these nurses, several alleged perpetrators of juvenile sexual abuse may have been successfully arrested, prosecuted, and imprisoned, and several alleged victims may have been removed from their homes and placed in foster care.

14.     Since defendants Gammick and Washoe County have contracted with CARES to provide forensic medical examinations on juveniles, the rate of successful prosecutions of child sexual abuse cases by the Washoe County DA's Office has increased dramatically.

15.     On or about December 20, 2001, Botello discovered an inconsistency that he found alarming in the sexual assault examinations of twin four-year-old females by CARES nurses Clarkson and Norberg for a case he was assigned to investigate:  One of the nurses, Clarkson, had concluded, based on three separate examinations, that one of the twins had an "absent hymen" and that the other had a "very thin almost gone" hymen. Clarkson's fellow CARES nurse, Norberg concluded in a later examination, that both twins had some hymenal tissue.

16.     Botello was alarmed at the inconsistency between the two nurses' findings because he was aware based on consultations with experts that it is impossible for a hymen, once gone, to regenerate. Assigned to investigate the twins' case, Botello had earlier relied on Nurse Clarkson's conclusion that their genitalia were consistent with sexual abuse and penetration. He had documented her conclusions in his investigative notes and notified Child Protective Services to remove the children from their home. Now he questioned the reliability of Clarkson's findings and was concerned that the twins may have been caused unnecessary trauma and that their family members may have been unfairly suspected of crimes that did not happen.

17.     Botello immediately notified his supervisors that there was a problem with the CARES' examinations of the twins and requested further documentation of their medical condition. In particular, he wanted to see the physician's case review and report so he could determine whether there was any physician oversight of the nurses' examinations. No copy of any physician's case review and report was ever provided to him, which caused Botello further

1  concern over possible improprieties in the CARES' program and inaccurate examinations by

2  Clarkson and Norberg.

3      18.    Botello's concerns extended well beyond the twins' case. Based on his experience as

4  an investigator in the field, he realized that several prosecutions of juvenile sexual assault suspects

5  over the previous two years may have been compromised by erroneous medical testimony by the

6  CARES nurses. If the CARES nurses couldn't recognize a hymen in the twins' case and if

7  physicians with expertise in the field weren't actually reviewing the CARES nurses' examinations,

8  Botello could only wonder whether the other CARES examinations performed over the duration of

9  the contract with Washoe County were similarly mistaken. It was crucial to Botello that Clarkson

10  and Norberg—whose testimony regularly resulted in criminal convictions—were providing

11  accurate information to the court.

12      19.    Botello's concerns about incompetence in the CARES program, and the nurses'

13  examinations, deepened when, in early June 2002, Botello learned that the twins' regular

14  pediatrician had examined them at the mother's request and concluded that they had **normal**

15  **genitalia**. The twins' physician referred them to Oakland Children's Hospital for further

16  examination and an expert medical opinion.

17      20.    Examination of the twins by Oakland Children's Hospital again confirmed that the

18  twins had normal genitalia. The report by Oakland Children's Hospital stated, "The amount of

19  hymenal tissue largely obscured direct visualization of the vagina." In a telephone conversation

20  with a staff member from Oakland Children's Hospital, Botello was told that the CARES nurses

21  had made "**a gross error**." Expert medical findings that the nurses had made such a derious error

22  further deepened Botello's concerns about the CARES program.

23      21.    Again, Botello contacted his supervisors to inform them of recent developments. This

24  time, he requested a formal audit of the CARES program and asked that Washoe County contract

25  with a provider other than CARES to ensure the integrity of future juvenile sexual assault

26  prosecutions.

27      22.    Meanwhile, to remove any lingering questions regarding the twins' condition, Botello

28  solicited a third-party review of Oakland Children's Hospital's findings from the CAARE

COMPLAINT—*BOTELLO v. GAMMICK et al.*

1    Diagnostic and Treatment Center at the University of California Davis Medical Center, a highly

2    reputed provider in the specialized field of juvenile sexual assault. He arranged for photos of the

3    twins' Oakland examination to be sent to UC-Davis for review.

4        23.    Soon after arranging for the review by UC-Davis, Botello received a voicemail

5    message on his work phone from defendant Deputy District Attorney Helzer instructing him that

6    NOTHING regarding the twins' examination was to be sent out of the office. This unusual

7    message from Helzer caused Botello to be concerned that the District Attorneys Office wanted to

8    cover up the CARES nurses' incompetence by keeping all information in-house, hence secret.

9        24.    On or about August 19, 2002, Botello received the third-party analysis from UC-Davis,

10   which again confirmed the twins to have **normal genitalia**. The report from UC-Davis stated,

11   "Both girls have a generous amount of hymenal tissue." This, of course, was the opposite of what

12   the two CARES nurses had concluded.

13       25.    With verification from the twins' pediatrician, Oakland Children's Hospital, and UC-

14   Davis Medical Center, Botello was certain that CARES nurse Clarkson was grossly mistaken in

15   her examinations of the twins. Again, he requested through his supervisors that the WCSO ask the

16   Nevada State Attorney General's Office to audit the CARES program, specifically forensic

17   medical examinations by the CARES nurse Clarkson.

18       26.    A necessary consequence of nurse Clarkson's report, the twins had been removed from

19   their home and two male individuals were suspected of sexual assault and subjected to

20   interrogation. Nurse Clarkson's report caused serious consequences – including the twins'

21   mother's divorce from the twin's stepfather, a suspect in that case – and enormous family

22   disruption for the girls, their family, and everyone involved in the case. Before such consequences

23   could reoccur based on Clarkson's examination, Botello wanted an audit of her findings.

24       27.    Botello advocated for an audit during several WCSO staff meetings and was informed

25   that there would be no outside audit of the CARES program or nurse Clarkson, and Washoe

26   County would continue contracting with CARES.   As a result of the meetings, Botello was

27

28

1    ordered to "keep his mouth shut" about the twins' case and, especially, to NOT talk with the

2    twins' father, a suspect in that case.

3         28.    Botello suddenly, and alarmingly, found himself in a political minefield – forced to

4    walk a tightrope between direct orders that he "keep his mouth shut" and his personal need to

5    know justice was being done. The belief that wrongful convictions based on inaccurate medical

6    testimony likely occurred caused Botello a crisis of conscience. He concluded he had to "do

7    something" and filed a complaint with the **Nevada Attorney General's Office** and the **Federal**

8    **Bureau of Investigation** ("FBI") alleging potential abuses in the CARES program.

9         29.    On or about August 29, 2002, Botello communicated with a local FBI agent regarding

10   a complaint filed with the FBI—not by him but by the twins' father, a former suspect in their case.

11   The father's complaint alleged "public corruption" by Washoe County District Attorney's Office

12   and a cover up of known problems with the CARES program. When questioned about the father's

13   complaint, Botello told the FBI agent that the allegations were "legitimate." The agent responded

14   that she did not think her office could be fair in investigating the father's complaint because of

15   personal ties to the District Attorney's Office.

16        30.    On or about September 9, 2002, Botello filed a complaint with the Nevada Attorney

17   General's Office requesting an investigation into the Washoe County District Attorney's CARES

18   program and possible cover-up by the Washoe County District Attorney's Office and Sheriff's

19   Department. He specifically requested that all CARES examinations by nurse Clarkson be audited

20   and that outside pediatricians medically review every examination she performed that resulted in

21   conviction. Botello stated:

22              It is the opinion of the undersigned given the facts established by the
                foregoing Criminal Investigation, Washoe County Sheriff's Office
23              Main Case Number WC01-00204427, that **innocent people have**
                **been willfully wrongly prosecuted by the Washoe County**
24              **District Attorney's Office**. . . .

25        Finally, Botello asked for protection against retaliation by Washoe County officials, citing

26   to Nevada's law protecting peace officers from reprisal for whistleblowing activity, NRS 289.110.

27        31.    Botello soon learned that the Nevada Attorney General's Office, like the FBI,

28   considered the case to be "too sensitive." An Attorney General investigator from that office told

1  him, "Don't be surprised if you don't hear from me again." The Attorney General investigator

2  further explained that his supervisor was married to one of the assistant district attorneys in the

3  Washoe County District Attorney's Office.

4      32.    Meantime, Botello was called to assist Sparks Police Department (SPD) in a separate

5  sexual assault investigation involving four- and five-year-old female victims. Botello saw that the

6  forensic reports completed by nurse Clarkson on the four- and five-year-old girls almost precisely

7  **mirrored the erroneous reports** she had generated in the earlier twins' case. He became

8  immediately suspicious of Clarkson's conclusions that one of the girls had an "absent" hymen. He

9  was concerned that the suspect had been arrested and incarcerated based on a false report by

10  CARES nurse Clarkson.

11     33.    Botello requested that the SPD detectives and the prosecuting Assistant District

12  Attorney, Cheryl Hier-Johnson, obtain a second medical opinion to confirm nurse Clarkson's

13  conclusions of sexual abuse. He wrote emails to Hier-Johnson questioning nurse Clarkson's

14  credibility and explaining how her conclusions in the earlier twins' case were contradicted by

15  three physicians. He insisted that a second opinion by a physician needed to be obtained.

16     34.    After Hier-Johnson failed to respond to Botello's concerns, he followed up his request

17  several times. Finally her boss, District Attorney Gammick, sent Botello a threatening email,

18  accusing him of not being a "team player" and creating an "adversarial relationship" with the

19  District Attorney's Office by filing his complaint with the Nevada Attorney General's Office.

20  Gammick further asserted that the District Attorney's Office **would not handle any criminal case**

21  **in which Botello was a witness** until the matter is "cleared up."

22      Did you go to both agencies accusing this office of some type of cover-up? I need
        to have an answer, because if that is true, then you have created an adversarial
23      relationship with the District Attorney's Office and **we will not handle any**
        **criminal case you are involved with in Washoe County if and until that matter**
24      **is cleared up**. . . . (emphasis added).

25      Gammick concluded with a veiled threat, "**I suggest that you do not continue down this**

26  **path and it may be too late already**."

27     35.    Botello saw the District Attorney's written communication to be an effort to stifle his

28  speech and retaliation for discussing the matter with the FBI and filing a complaint with the

COMPLAINT—*BOTELLO v. GAMMICK  et al.*                                    PAGE 9

1   Nevada Attorney General. If the District Attorney were to make good on his threat to prevent him

2   from testifying in criminal cases he investigated, Botello would be unable to perform his job

3   functions because providing such testimony was an integral aspect of his job as a crime

4   investigator.

5       36.     Botello was later subpoenaed to testify at the preliminary hearing of the suspect in the

6   case involving the four and five year old girls. However, for reasons out of his control, he did not

7   have an adequate opportunity to review the video transcripts of interviews conducted in that case.

8   He had to testify based on his recollection of the interviews, which took place much earlier. Before

9   providing his recollections, Botello truthfully testified that he had not been able to review the

10  video transcripts and that his memory of the interviews was not clear.

11      37.     After Botello testified in the case involving the four and five year old girls, District

12  Attorney Gammick **falsely accused him of perjury** based on perceived inconsistencies in

13  Botello's testimony at the preliminary hearing and the actual video transcripts of the interviews.

14  Botello believes that Gammick is pursuing false claims of perjury against Botello in retaliation for

15  his speaking out regarding abuses in the CARES program and filing a complaint with the Nevada

16  Attorney General's Office.

17      38.     Subsequently, in a third case, Botello assisted a non-Spanish-speaking WCSO officer

18  in interrogating a Spanish-speaking suspect who confessed to attempting to sexually assault a

19  thirteen-year-old female. The prosecuting Assistant District Attorney, after consulting with her

20  boss Deputy District Attorney Helzer, **refused to prosecute** the suspect after Botello issued his

21  investigative report..

22      39.     In mid-September 2002— Botello resigned from WCSO and accepted a position with

23  the Washoe County School District ("WCSD") Police Department investigating crimes, including

24  sex crimes, against juveniles. Prior to accepting his new position, Botello was called in from the

25  field to meet with Sheriff Balaam. Balaam asked him both verbally and in a written memorandum

26  to **reconsider his resignation**. In his memorandum, Balaam praised Botello:

27              The willingness of individuals to speak out when legitimate
                concerns are raised lies at the heart of our duty as citizens and peace
28              officers. Accordingly, I have directed that the investigation of your

COMPLAINT—*BOTELLO v. GAMMICK et al.*

alleged misconduct in regard to disclosure of your concerns to the suspect – or any other third party – be terminated. . . .

[I] encourage you to remain in your current position with our office. Dedicated and honest employees are the hallmark of this Office and a credit to our co-workers and the citizens that we serve.

40.    Around this same time—not knowing that Botello had already accepted an offer of employment with WCSD Police Department—defendant Helzer, on defendant Gammick's behalf, contacted a member of the WCSD Police Department hiring committee in a retaliatory effort to interfere with Botello's prospects for employment with the school district. In his communication, Helzer challenged Botello's professionalism:   He claimed Botello was "not a team player" and stated that Botello "created an adversarial relationship" with the District Attorney's Office in asking the State Attorney General's Office to audit the CARES Program. Shocked at Helzer's brazen attack on Botello, the hiring committee member immediately informed Botello of the communication.

41.    On or about September 27, 2002, Botello left his position with WCSO and began working as a WCSD school police officer and detective.   Botello was informed that Deputy District Attorney Helzer continued to communicate with the WCSD police department his assertions that the District Attorney's Office **would reject for prosecution any case in which Botello is a witness**. The repeated reason for this "non-prosecution" policy was that Botello had created an adversarial relationship with the District Attorney's Office by complaining to the state Attorney General's Office about the DA's CARES Program.

42.    On or about January 6, 2003, Botello handled a sexual abuse/exploitation case for the WCSD Police Department involving a teacher's aid and six student victims. The following day, having finished interviewing the victims and several other witnesses, Botello scheduled an interview with the suspect. Given the seriousness of that case, Botello's supervisor immediately notified the Washoe County District Attorney's Office and talked to defendant Helzer about prosecuting the case. Once again, Helzer made clear to Botello's supervisor that the District Attorney's Office **would refuse to file the case if Botello's name appeared on the police report**.

43.     In the morning of January 8, 2003—as Botello's superiors informed him—defendant Gammick personally telephoned WCSD Interim Police Chief Mieras, Botello's boss, and advised him to have the Reno Police Department take over the case from Botello. After consultations between WCSD and RPD, the RPD detectives maintained that Botello should continue investigating the case because he had already conducted extensive interviews of multiple victims.

44.     In the afternoon of January 8, 2003, Chief Mieras, Botello's immediate supervisor, and two RPD officials personally met with defendant Gammick to advocate for Botello's continuing with the case. Gammick was adamant that if Botello were to conduct the interrogation of the suspect, he would refuse to prosecute the case. Gammick then advised the police chief and other officials present that Botello must be relieved from involvement in the case.

45.     As a result of the meeting with District Attorney Gammick, Botello's superiors at WCSD concluded they were not free to let him proceed with the interrogation of the suspect and informed Botello of their conclusion. The case needed to be prosecuted, and Gammick refused to prosecute the case if Botello continued to be involved. Accordingly, they removed him from the investigation.

46.     On or about January 16, 2003, defendant Gammick again met with WCSD Police Chief Mike Mieras and Botello's supervisor. At the meeting, Gammick restated his policy of refusing to prosecute Botello's cases. He then repeated that Botello was not "a team player," to which he added a defamatory, false assertion that Botello had perjured himself. Gammick promised to forward a formal letter confirming his position.

47.     On or about January 27, 2003, Botello filed a complaint with the Federal Bureau of Investigation (FBI) alleging the following violations of federal law by defendants Gammick and Helzer:

> (a)    18 U.S.C. § 245(b)(c) – for intimidating Botello and interfering under color of authority with Botello's application for employment with the WCSD Police Department
>
> (b)    18 U.S.C. § 242 – for willfully, under color of law, subjecting Botello and others to the deprivation of their First Amendment right to speak up, making disclosure about the possible criminal and non-criminal problems with the CARE program

COMPLAINT—*BOTELLO v. GAMMICK et al.*                                                                    PAGE 12

1

          (c)   18 U.S.C. § 241 – for conspiring to oppress, threaten and intimidate Botello for the purpose of securing his silence.

2

48.   In his complaint to the FBI, Botello further alleged that:

3

        The Office of the Washoe County District Attorney may have willfully, wrongly and negligently prosecuted possibly innocent people accused of sex crimes against children.

4

5

49.   In his complaint to the FBI, Botello further requested that the FBI conduct "a thorough

6

investigation of the Washoe County District Attorney's retaliation against the under signed for

7

revealing possible criminal violations to the Nevada State Attorney General. . .and a thorough

8

audit of all CARE examination performed by CARE Nurses and a medical review by pediatric

9

medical doctor(s) of said examinations resulting in successful prosecutions."

10

50.   On or about February 7, 2003, Chief Mieras received the following letter signed by

11

defendant Helzer, which confirmed in writing the Washoe County District Attorney's Office

12

retaliatory policy of refusing to prosecute any cases in which Botello is a witness:

13

        Pursuant to your request, I am writing to express the position of the Washoe County District Attorney's Office concerning Detective Botello. **The Washoe County District Attorney's Office will not accept for prosecution a case in which Detective Botello is a witness.** If you want an explanation as to why we have found it necessary to take this position, I will provide such upon receipt of a release signed by Detective Botello. . . .

14

15

16

17

18

51.   Chief Mieras, on advice from the school district's legal counsel, immediately relieved

19

Botello from his investigative duties to prevent his becoming a witness to any crime in which he

20

might be compelled to make an arrest. Botello was reassigned temporarily to a desk job so as not

21

to generate any conflicts with the District Attorney's policy.

22

52.   On or about February 10, 2003, Botello supplemented his FBI complaint, informing the

23

FBI of the letter received from the Washoe County District Attorney's Office and his subsequent

24

reassignment. Botello stated:

25

        The Washoe County District Attorney, Richard Gammick's , and the Washoe County Assistant District Attorney, John W. Helzer's, relentless threats and harassment have now significantly affected my employment. My employer received the attached letter [see previous two paragraphs] and removed me from my patrol duties reassigning me to 'desk' duties limiting my peace officer status.

26

27

28

> It is crucial that you understand my attentions have always been innocent and somewhat naïve. I only wanted the Office of the Washoe County District Attorney to be aware of the extreme discrepancy within its' CARE Program. It was not until 01-06-03, when Mr. Gammick and Mr. Helzer strongly interfered with an investigation which I was conducting of a teacher aid who was sexually abusing of students in one of our public schools that it was made obvious that Mr. Gammick's and Mr. Helzer's intent is ill willed. . . .

53.   After two weeks passed with no communication from the District Attorney's Office, Botello was restored to his patrol position. He is at high risk of reassignment back to a desk position the next time he becomes involved in investigating a criminal case if he does not lose his job altogether.

54.   On March 3, 2003, Chief Mieras received the following letter from defendant Helzer:

> Pursuant to the request set forth in your letter of February 7, 2003, I am providing you with a release for the signature of Detective Botello. Upon Detective Botello's signing of this document, I will more fully explain to the Washoe County School District Police department the reasons for the position taken in my letter of February 5, 2003. . . .

55.   Accompanying this most recent letter from defendant Helzer was a "Consent for Washoe County District Attorney's Office to Provide Information - Release of All Claims and of Liability." This blanket release, which Botello was to sign, would forever waive any and all rights Botello might otherwise have to seek redress for "any act or failure to act of Washoe County, its respective officers, agents and/or employees" – no time limits, no restrictions, no exceptions for slander or outright lies.

56.   By presenting Botello's employer with this "release" in exchange for information, defendants Helzer and Gammick seek further to jeopardize Botello's new employment with the WCSD Police Department in retaliation for his whistleblowing activity. They are attempting to extort a release of liability from Botello for malfeasance on their part while pressuring his new employer to fire him based on his inability to have criminal cases he investigates prosecuted.

57.   Defendants' conduct has caused plaintiff Botello severe emotional and physical injury, including but not limited to a stress-related irritable bowel syndrome, which has caused him to

COMPLAINT—*BOTELLO v. GAMMICK  et al.*                                    PAGE 14

1 miss several days of work and for which he sought emergency treatment and was hospitalized in
2 February 2003.

### FIRST CAUSE OF ACTION

(First Amendment, U.S. Constitution)

58.    Plaintiff Botello realleges and incorporates each and every allegation contained in the preceding paragraphs.

59.    Plaintiff Botello has a clearly established right to be free of intentional retaliation by government officials, including defendants Gammick and Helzer, based on his constitutionally protected expression in complaining to his superiors, the Nevada Attorney General's Office, and the FBI regarding perceived abuses in the CARES program.

60.    Plaintiff Botello's speech is of public importance because it addresses the District Attorney's Office knowingly and unlawfully prosecuting sexual assault cases based on CARES forensic medical evidence with the result that potentially innocent persons have been and continue to be incarcerated based on testimony known to be discredited.

61.    Plaintiff Botello has a First Amendment right to speak out on these issues of public importance without suffering adverse employment actions.

62.    In retaliation for plaintiff's exercise of his First Amendment rights, defendants Gammick and Helzer have interfered in a valuable government right and privilege and subjected plaintiff to adverse employment actions including but not limited to:

- Harassing plaintiff;
- Communicating with his new employer in an attempt to prevent him from being hired;
- Falsely alleging to his new employer and colleagues that he committed perjury; and
- Interfering with his employment description by adopting a policy of refusing to prosecute cases investigated by plaintiff, thereby forcing his new employer to remove him from patrol and assign him to a desk job to prevent his becoming a witness to crimes.

63.    Reasonable officials in the position of defendants Gammick and Helzer would have known that it was unlawful to retaliate against plaintiff for exercise of his First Amendment rights.

64.    Absent plaintiff's protected speech—his speaking out and whistleblowing activity concerning the competence of CARES nurse Clarkson and the validity of the CARES program— the retaliation from defendants Gammick and Helzer would not have occurred.

65.    As a direct and proximate result of the aforedescribed unlawful, wanton, and malicious conduct by Defendants Gammick and Helzer committed individually and in concert, under color of law, and under their authority respectively as Washoe County District Attorney and Washoe County Deputy District Attorney, plaintiff Botello suffered grievous injury including but not limited to loss of valuable job benefits, physical injury, humiliation, and emotional distress.

66.    Defendant Washoe County is liable for unconstitutional acts by defendants Gammick and Helzer because Gammick, a policymaker for Washoe County, specifically adopted a policy of retaliation against plaintiff for his speech and ratified all acts of Helzer.

67.    The acts of defendants Gammick and Helzer as aforedescribed were intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's constitutional rights thus entitling plaintiff to an award of punitive damages against said defendants in their individual capacity.

## SECOND CAUSE OF ACTION

(Fourteenth Amendment: Deprivation of Liberty Without Due Process)

68.    Plaintiff Botello realleges and incorporates each and every allegation contained in the preceding paragraphs.

69.    A governmental official may not deprive a person of the freedom to engage in any of the common occupations of life without due process.

70.    By attempting to convince the WCSD to not hire plaintiff, by refusing to prosecute any cases plaintiff investigates, and by defaming him defendants Gammick and Helzer stigmatized plaintiff by creating a false negative impression regarding plaintiff, seriously damaging his standing and associations in his community and/or imposing on him a stigma or other disability

1   that interfered with his current employment and foreclosed his freedom to take advantage of other
2   employment opportunities.

3       71.   By refusing to prosecute plaintiff Botello's cases, defendants have substantially
4   interfered with his job description.

5       72.   As a direct and proximate result of the aforedescribed unlawful, wanton, and malicious
6   conduct by Defendants Gammick and Helzer committed individually and in concert, under color
7   of law, and under their authority respectively as Washoe County District Attorney and Washoe
8   County Deputy District Attorney, plaintiff suffered interference with his job description, grievous
9   injury, humiliation, and emotional distress.

10      73.   Defendant Washoe County is liable for unconstitutional acts by defendants Gammick
11  and Helzer because defendant Gammick, a policymaker for Washoe County, specifically adopted
12  a policy of retaliation against plaintiff for his speech and ratified all acts of defendant Helzer.

13      74.   The acts of defendants Gammick and Helzer as aforedescribed were intentional,
14  wanton, malicious and oppressive and made with reckless indifference to plaintiff's constitutional
15  rights thus entitling plaintiff to an award of punitive damages against said defendants in their
16  individual capacity.

17                          **THIRD CAUSE OF ACTION**

18                          (Nevada law: Defamation)

19      75.   Plaintiff Botello realleges and incorporates each and every allegation contained in the
20  preceding paragraphs.

21      76.   Defendants Gammick and Helzer made false and defamatory statements concerning
22  plaintiff in his professional capacity to his employer and colleagues in the law enforcement
23  community, including but not limited to false allegations that plaintiff committed perjury in the
24  performance of his duties as a sexual assault investigator and witness.

25      77.   The defamatory statements made by defendants Gammick and Helzer were published
26  to third parties, including plaintiff's current employer and his law enforcement colleagues, and
27  were not privileged.

28

COMPLAINT—*BOTELLO v. GAMMICK et al.*                                    PAGE 17

78. Defendants Gammick and Helzer acted with the requisite degree of fault in that their acts were intentional.

79. Defendants' defamatory statements are actionable per se; alternatively, defendants' defamatory statements are the cause of injury sustained by plaintiff.

80. The acts of defendants Gammick and Helzer as aforedescribed were intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's rights thus entitling plaintiff to an award of punitive damages.

### FOURTH CAUSE OF ACTION

(Nevada Law: Intentional Infliction of Emotional Distress)

81. Plaintiff Botello realleges and incorporates each and every allegation contained in the preceding paragraphs.

82. Defendants Gammick and Helzer engaged in extreme and outrageous conduct, including but not limited to attempting to interfere with plaintiff's new employment with the WCSD Police Department, defaming plaintiff and refusing to prosecute any cases plaintiff investigates, thereby foreclosing plaintiff's ability to perform his job functions.

83. Defendants did so with either the intention of, or reckless disregard for, causing plaintiff to suffer emotional distress.

84. As a result of defendants' conduct, plaintiff suffered severe or extreme emotional distress, which included but was not limited to a stress-related physical injury requiring hospitalization.

85. The conduct of the defendants was the proximate cause of the emotional distress suffered.

86. As a direct and proximate result of the aforedescribed unlawful, wanton, and malicious conduct by Defendants Gammick and Helzer committed individually and in concert, under color of law, and under their authority respectively as Washoe County District Attorney and Washoe County Deputy District Attorney, plaintiff suffered grievous injuries, including but not limited to interference with job description, physical injury, humiliation, and emotional distress.

87.   The acts of defendants Gammick and Helzer as aforedescribed were intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's rights thus entitling plaintiff to an award of punitive damages.

### FIFTH CAUSE OF ACTION

(Nevada Law: Intentional Interference with Contract/Business Relationship)

88.   Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

89.   Plaintiff Botello has a valid and existing contract for employment/business relationship with the Washoe County School District.

90.   Defendants are aware of such contract/business relationship.

91.   Defendants have engaged in intentional acts intended or designed to disrupt plaintiffs' contractual employment/business relationship with the Washoe County School District.

92.   Defendants have actually disrupted such employment contract/business relationship, inter alia, by forcing plaintiff's reassignment from patrol duties to a desk position.

93.   Defendants' conduct in intentionally disrupting plaintiff's employment/business relationship has caused plaintiff to suffer damages.

94.   As a direct and proximate result of the aforedescribed unlawful, wanton, and malicious conduct by Defendants Gammick and Helzer committed individually and in concert, under color of law, and under their authority respectively as Washoe County District Attorney and Washoe County Deputy District Attorney, plaintiff suffered interference with job description, physical injury, humiliation, and emotional distress.

### PRAYER FOR RELIEF

95.   WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

(a)   For an injunction prohibiting the policies, practices, and acts complained of herein;

(b)   For a declarative judgment that the policies, practiced, and acts complained of herein are illegal and unconstitutional;

(c)   For compensatory damages from Defendants in an amount to be determined at trial;

(d)  For punitive damages from the individual Defendants, for Plaintiff, in an amount to be determined at trial;

(e)  For nominal damages;

(f)  For attorney fees and costs incurred herein;

(g)  For leave to amend this complaint should the same become necessary;

(h)  For such other and further relief as this Court may deem appropriate.

Dated: this 14 day of _April_____, 2003

TERRI KEYSER-COOPER
DIANE K. VAILLANCOURT
Attorneys for Plaintiff Rene Botello

COMPLAINT—*BOTELLO v. GAMMICK et al.*